### Complaint of BROADVIEW COUNTRY CLUB CIVIC ASSOCIATION against BROADVIEW UTILITIES CORPORATION.

Docket No. 70173-WS, Order No. 4997.

Florida Public Service Commission.

December 11, 1970.

William E. Conway, Fort Lauderdale, for the complainant.

David S. Kenin, Miami, for the respondent.

R. M. C. Rose, Tallahassee, for the commission staff and the public generally.

Chairman WILLIAM T. MAYO, Commissioners JERRY W. CARTER and JESS YARBOROUGH participated in the disposition of this matter.

BY THE COMMISSION.

Pursuant to notice, the commission, by its duly designated hearing examiner, Leon F. Olmstead, held a public hearing on the above matter on July 8, 1970, in Margate, Florida. The examiner's

recommended order was published on September 9, 1970, to which the respondent utility duly filed exceptions. Oral argument on the utility's exceptions to the examiner's recommended order was heard by the commission on October 26, 1970, in Winter Park, Florida.

After studying the entire record in this file, including the transcript, testimony, exhibits admitted into evidence, examiner's recommended order and the exceptions filed thereto and the argument of counsel, we now issue our order herein.

Broadview Utilities Corporation (hereinafter referred to as "Broadview" or "the company") operates a water utility and a sewer utility in Broward County, pursuant to the authority granted by certificates of public convenience and necessity nos. WS-17 and SS-15, respectively. The investigation in this docket was instituted by order no. 4879, pursuant to the complainant's allegations of inadequate, inefficient and insufficient service. Each allegation will be enumerated and discussed in turn.

*Specific complaints*

1. *Broadview Utilities' plant is not capable of properly treating the sanitary needs of the community due to obsolescent and poorly maintained equipment —*

Sewerage back-ups overflowing into houses and yards were clearly shown to have occurred many times. One lift-station periodically discharged what appeared, from color and odor, to be raw sewerage through a vent pipe. Broadview has programmed relocation of a pressure line and is cleaning the actuating device of the liftstation, malfunctioning of which caused the first problem, and has made corrections to eliminate the latter. There were no recorded occurrences of sewerage back-ups within the three weeks prior to the hearing, or any recent observation of the apparent sewerage discharge from the vent pipe.

To this point, we have essentially followed the examiner's recommended order, but our study of the transcript of testimony in this case brings to light one particular complaint which we feel merits specific attention.

Mrs. Teresa Maheu, who resides at 6500 S. W. 16th Court, Pompano Beach, gave unrebutted testimony that she and her family have experienced raw sewerage back-ups into her yard or into her home some 136 times over the last 2½ years.

The record further reflects that Mrs. Maheu has paid fully and promptly her bills for sewerage service. We find that Mrs. Maheu and her family have been unreasonably offended and inconvenienced by this public utility for the period in which they have

resided at this residence and will, by the provisions of this order, make Mrs. Maheu the judge of satisfactory efforts to eliminate the source of this obnoxious intrusion upon the enjoyment of her property.

With the exception of the two above noted items, there was no evidence of deficiencies in the sewerage collection or treatment system.

2. *The waste is not thoroughly and adequately treated —*

There was no evidence to support this allegation.

3. *The waste is not properly disposed of —*

There was no evidence to support this allegation.

4. *Numerous fire hydrants are not properly maintained and, therefore, are inoperative and ineffective, resulting in a great risk to the community.*

The examiner found that seven of the twenty-four fire hydrants inspected were inoperative and that pressure on the balance of the fire hydrants ranged from 50 to 65 lbs. The examiner further reported that the company is uncertain of its responsibility with regard to the hydrants. The examiner recommended that the hydrants be repaired and properly maintained because, he found, it was obvious that fire protection is one of the essential services furnished by the water system so constructed and the failure to properly maintain the hydrants was a failure by the company to properly discharge its duty.

By its exceptions to the examiner's recommended order, the company points out that it is not certain of its duties or rights in this field since its tariff makes no provisions for fire hydrants and fire service.

We well recognize that the company may not be required to provide service without reasonable compensation, but we certainly recognize the good sense of our examiner's recommendation. The provisions of subsection (2) of §367.13, Florida Statutes, provide an adequate remedy for the solution of this problem. By our ordering paragraph, we will require the utility to file with us a request to provide a new class of service for fire service and fix therefor just, fair, reasonable and compensatory rates and charges.

5. *There are frequently long delays in restoring service when it is interrupted. —*

Such delays are due to an apparent lack of competent working and engineering personnel, as well as limited availability of personnel to rectify such problems. Interruptions of service have occurred

due to line breakage on the initiation of new service and equipment break-down. Breakages not due to company fault were repaired as quickly and expeditiously as possible. Interruptions for initiation of new service were not made with regard to periods of customers' usage, nor was notice given to the existing customers.

The examiner then noted the equipment break-down of May 22, 1970. Testimony upon which this finding was made was given by witness John Campbell. Not only was it established that Mr. Campbell may well have been wrong about the date and duration of the interruption of service, but Mr. Campbell testified that he was an engineer registered in the state of Florida and, at the direction of the examiner, promised to file with us a copy of his certificate of registration as an engineer.

When the promised certificate copy was not forthcoming within the time set by the examiner (and we note that it has not been filed to this date) our staff attorney filed with the examiner a motion to strike the testimony of the witness. The examiner did not rule on this motion.

We find the grounds set forth in the motion are both proper and reasonable and that it should be granted and the testimony of this witness be stricken from the record of this proceeding.

The examiner does note, and we agree, that there is no evidence in this record of compliance with our Rule 25-10.56 (310-10.50) which relates to credit for time out of service.

The company stated that it has embarked upon an aggressive program of preventive maintenance which should identify the causes of service deficiencies and interruptions and enable the correction of such problems before they become major.

Outside firms are employed to make repairs in instances of major service outages, so the allegations of repair personnel deficiencies are not substantiated.

6. *The handling of home owner complaints is done in an arbitrary, indifferent and surly manner.* —

Mr. William Donner, the supervisory manager, is only at the company office from 9 a.m. until about 1:30 p.m. to receive complaints. Apparently, he has not delegated authority to his employees to resolve customer complaints, nor has he arranged for an employee to receive after hours service complaints. Broadview has one uncertified operator for the water and sewer plants who also attempts to resolve service complaints. In view of the size of this utility, this does not seem to be a major problem, but some means of contacting company personnel to notify them of service outages

or serious complaints should be established and advertised by the utility on its bills for service.

> 7. *Numerous and serious plant and equipment deficiencies have been noted by the Broward County Health Department as of February 13, 1970 and March 15, 1970. The most serious have not been rectified.* —

These complaints had largely been corrected by the hearing date, except that a certified operator for the respective plants has not been obtained. (A certified operator visits the plant four times weekly, does certain testing and advises the uncertified operator.)

Our examiner proceeds then to findings regarding the capacity of a water treatment device known as an accelator, and the present need for an additional accelator.

The company took exception to the examiner's findings and we must agree that the examiner's findings on the capacity and immediate need for this additional accelator are not borne out by the record.

Milky water, which is apparently produced by the faulty operation of the device, has been reported in the proceedings in this docket. Since the utility has convinced us that a new or additional accelator is not needed at the present time, it has the burden of showing us that it can operate the existing one properly so as to produce that quality of good, clear water to which the customers are entitled.

> 8. *The service rendered customers on billing and banking errors has shown the utility to be callous as to the needs and currents of every day good business practices.* —

There was no evidence to substantiate this allegation. It was admitted that all of Broadview's personnel were polite, courteous and businesslike. Mr. Donner was characterized as brusque and to the point, but polite. There was no showing of any action by the company not substantially consistent with the day-to-day contact of a business activity dealing with many different people from whom money must be collected. But we caution the utility's representatives not to construe our findings as a license for rudeness or indifference.

> 9. *Service has been arbitrarily shut off on the basis of misunderstanding and abrupt action by the utility without the shallowest investigation of the inequities involved.* —

One complainant herein was shown to have been billed on May 28, 1970, and a delinquent notice issued on June 17, threatening service termination by June 23. This action by the company is in

accordance with the provisions of Broadview's tariff, although compliance with Rule 25-10.74(2)(g) (310-10.65(2)(g) relative to a diligent attempt to obtain payment might be questionable had the service been terminated.

Another complained that she was threatened with service termination after one week's delinquency. No rebuttal to her testimony was submitted by the company, so her testimony is accepted as true.

Our examiner goes on to conclude that considering the amount of the particular bill and the tariff provisions, this complaint was not considered valid in view of the fact that there were no terminations, only threats, which accomplished the desired result. The record is devoid of testimony which would indicate that we should differ with the examiner's finding on this point and we, therefore, adopt it as our own.

In addition to the above complaints enumerated in order no. 4879, the customers at the hearing complained that the company does not replace broken meter boxes, creating a safety hazard. Usually, the first broken meter box cover is replaced by the company. Thereafter, the customers are told that it is up to them to replace the meter box cover, or pay the company for doing it. There was no evidence to demonstrate who broke the covers which appeared to be of unreinforced concrete. Requests for cast iron or steel meter box covers were dismissed as too expensive.

The broken meter box covers create a safety hazard for the public. Ownership of the meter box and the lid remains in the utility so the responsibility for the maintenance, absent the fault of the property owner, does rest with the company as provided by Rule 25-10.45 (310-10.44).

One final complaint was that of inadequate water pressure, and it is apparent that this complaint is due to the customer operating too many outlets for the size of the service. Since the problem arises on the customer's side of the meter, we do not find that the complaint was shown to be due to the company's service deficiency.

## General

The company's treatment plants are dirty, poorly kept and run-down. The security fence around the treatment plant site has not been installed. The railing and grade around the water system need painting. The laboratory was dirty with test equipment sitting out in the open, reagent bottles were dirty and the reagents were of unknown age, although they must be fresh to provide reliable test indications. The generally dirty and run-down condition of the plant reflects the poor attitude of the operator and this company's management.

Due to complaints received, and to up-grade its systems to meet pending waste-water treatment requirements and growth, Broadview retained a utility consultant firm in late 1969, to locate and correct plant deficiencies. This program led to the sealing of manholes and lines to eliminate water infiltration into the waste-water collection lines, engineering of plant expansion and up-grading and correction of defects in its plants.

On the whole, it appears that Broadview is making a diligent effort to operate this system properly. In order to obtain its objectives, a certified operator needs to enjoy closer supervision and authority. The utility must replace broken meter box covers and install a security fence around the treatment plant site. As we have noted earlier, the fire hydrants must be repaired and properly maintained, and the dirty and run-down conditions around the water and sewerage treatment plants must be corrected, including obtaining and properly maintaining laboratory reagents. Upon the full showing that these conditions, together with those previously noted, have been obtained, this investigation may be closed. However, the unsatisfactory conditions of this utility's service and equipment have lasted too long, and should the utility fail or refuse to take immediate remedial steps, we will consider appropriate action.

It is therefore ordered that Broadview Utilities Corporation shall within five days of the last day of each month obtain, for a period of six months, from Mrs. Teresa Maheu, who resides at 6500 S. W. 16th Court, Pompano Beach, a brief statement regarding sewer service to her residence, covering the previous one-month period and shall, within five days, file said brief statement with this commission.

It is further ordered that Broadview Utilities Corporation shall place each of the fire hydrants located within the confines of the territory defined by certificate no. WS-17 in proper operating condition within thirty days of the date of this order.

It is further ordered that Broadview Utilities Corporation shall, within sixty days of the date of this order, enclose its water and sewerage treatment plant sites within a fence of such quality and dimensions as shall reasonably serve it as a security fence.

It is further ordered that Broadview Utilities Corporation shall replace all broken meter box covers not clearly shown to be broken by the utility's customer served by the meter.

It is further ordered that Broadview Utilities Corporation shall, within thirty days of the date of this order, do the following —

1. Clean and make orderly and neat its laboratory.

2. Obtain and properly house and maintain its chemical reagents.

3. Clean, paint and make neat and orderly the water and sewerage treatment plant site, and the buildings, structures and equipment kept or to be kept thereon.

4. File with this commission a request or application to provide a new class of service as set forth in subsection (2) of §367.13, Florida Statutes, relating to fire protection.

5. File with this commission a copy of the written program of preventive maintenance.

6. Secure and advertise on its bills for service the means by which the customers of the utility may quickly and effectively communicate serious service complaints and outages to Broadview's personnel, agents and representatives during hours or days when its office is closed, and report this information within fifteen days from the date hereof to this commission.

7. Report to this commission within five days of the last day of each month, for a period of six months, on Broadview's efforts, and the results of those efforts, to properly operate the accelator.

It is further ordered that if Broadview Utilities Corporation shall fail or refuse to adhere to each of our orders herein, this commission shall, upon such failure or refusal, consider appropriate punitive action and shall further consider whether or not certificate nos. WS-17 and SS-15 shall be revoked.